Gordon DEISCH, Individually, Regency Construction, a Corporation, Patio Homes Partnership, and Betty Tuttle, Individually, Appellants (Defendants),

v.

Amos JAY, Jean Jay, Robert E. Himes and Evelyn Himes, Appellees (Plaintiffs).

Amos JAY, Jean Jay, Robert E. Himes, and Evelyn Himes, Appellants (Plaintiffs),

v.

Gordon DEISCH, Individually Regency Construction, a Corporation, Patio Homes Partnership, and Betty Tuttle, Individually, Appellees (Defendants).

Nos. 89–57, 89–58.

Supreme Court of Wyoming.

April 19, 1990.

Steven F. Freudenthal of Herschler, Freudental, Salzburg, Bonds & Rideout, P.C., Cheyenne, for appellants in No. 89–57 and appellees in No. 89–58.

Robert B. Carroll, Cheyenne, for appellees No. 89–57 and appellants in No. 89–58.

Before CARDINE, C.J., and THOMAS, MACY, GOLDEN, JJ., and WOLFE, D.J.

GOLDEN, Justice.

The major issue in this appeal concerns the nature of a residence builder-vendor's implied warranty of workmanship and fitness for habitation given to the residence owner.

The builder-vendor of two townhouses appeals the court's judgment awarding money damages to two homeowners in their action which alleged that the builder-vendor had negligently constructed their townhouses or had breached an implied warranty of workmanship and fitness for habitation. Cross-appealing, the two homeowners claim that they received inadequate damages awards.[1]

We affirm in all respects.

In its appeal, builder-vendor states the issues in this way:

1. Whether the scope and meaning of the implied warranty of habitability for a residence adopted by the trial court— whether a reasonable person faced with such a defect would be warranted in concluding that a major impediment to habitation existed—is the proper legal standard under Wyoming law?

2. If the legal standard adopted by the trial court is correct, whether the trial court properly applied the standard to conclude that a defect which would "discourage" improvements such as a basement bedroom constituted a major impediment to habitation when the trial court had previously concluded that the townhomes were habitable and the "basements are likewise habitable, at least as presently used?"

3. Whether the judgment of the trial court can stand when the evidence most favorably construed to the plaintiffs was that Plaintiffs held a subjective belief that the alleged defect prevented im-

---

1. Pursuant to stipulation by the parties, an order dated September 14, 1988, dismissed with prejudice the defendant Betty Tuttle, who had formed the Patio Partnership with Gordon Deisch/Regency Construction Company, Inc.

provements to their unfinished basements satisfactory to them?

4. Whether the Plaintiffs Jays failed to mitigate their damages with regard to the band instruments?

5. Whether the trial court's findings and judgment are clearly erroneous, unsupported by or contrary to the evidence, or against the great weight of the evidence?

Homeowners assert the issues as follows:

I. Does the scope of the implied warranty of habitability in Wyoming require a residence to be totally uninhabitable?

II. Did plaintiffs take reasonable steps to mitigate the damages to their basements and property?

In the homeowners' cross-appeal, the homeowners state the sole issue as:

"Were Plaintiffs awarded adequate compensation for costs of repairs to their basements?"

Builder-vendor states the issue as:

Was there sufficient evidence to support the trial court's findings with respect to damages?

## FACTS

Regency Construction Company, Inc. (Builder-vendor), in 1982–83 constructed residential townhomes in the vicinity of Carlson and Sycamore Streets in Cheyenne, Wyoming. Builder-vendor sold one of these townhomes directly to Mr. and Mrs. Amos Jay (Jays). Builder-vendor sold another of these townhomes to Mr. and Mrs. Arthur Schliske, who in turn sold the townhome to Mr. and Mrs. Robert E. Himes (Himes).

Both the Jays and the Himes experienced excessive humidity and dampness problems in their basements which resulted in the development of mold and mildew and an offensive odor. Some of their personal property stored in the basement was damaged. As a result, they brought an action on May 11, 1988, against Builder-vendor alleging negligent construction of their townhomes and breach of an implied warranty of habitability. For relief, they sought either specific performance to correct basement defects or money damages to compensate them for the loss of value of their townhomes or removal and replacement of their basement floors or for loss of use of their basements. They did not seek rescission and restitution.

At the bench trial, both parties introduced lay and expert testimony concerning the existence, nature and extent, and cause of the excessive humidity and dampness in the basements. They also introduced expert evidence about the appropriate repairs and costs of repairs. As to be expected, the parties' evidence was in conflict on many of these matters. Not in conflict, however, was that neither the Jays nor the Himes was forced by the alleged defects to abandon living in their townhomes and using in normal fashion the areas apart from the basements.

Sorting through the conflicting evidence, the trial court concluded that, more likely than not, a perched water table in the ground underlying the basements existed as a source of moisture from which capillary action was fed, leading to excessive humidity and dampness in the basements. Further, the trial court concluded that the builder-vendor's evidence on the appropriate remedy of installing a capillary break and on the cost of that remedy was reasonable under all the circumstances. As a result of these conclusions, the trial court found in favor of the homeowners on their theory of breach of an implied warranty of habitability, but not on their theory of negligent construction. Each homeowner was awarded the sum of $1,980 for diminution in value of their townhome. Additionally, the Jays were awarded $765 for personal property damages and the Himes were awarded $87.04 for certain repair bills. These appeals followed.

## ANALYSIS

### 1. BUILDER–VENDOR'S APPEAL

Builder-vendor mounts a double-edged attack on the judgment in favor of the homeowners. First, the builder-vendor claims that the trial court departed from

this court's rule of liability for the breach of an implied warranty of habitability first established for new homeowners in *Tavares v. Horstman*, 542 P.2d 1275 (Wyo. 1975) and then extended to subsequent purchasers in *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733 (Wyo.1979). Builder-vendor states the rule to be that an implied warranty of habitability is breached only by major defects which render the house unfit for habitation. Using that statement of the rule, the builder-vendor then argues that the evidence showed no major defects existed in either townhome and neither townhome was unfit for habitation. Second, the builder-vendor claims that the evidence showed that the Jays failed to mitigate their personal property damages for which they were awarded $765. We shall discuss each claim in order.

• *Implied Warranty of Habitability*

■ Builder-vendor incorrectly states the rule of implied warranty of habitability adopted by this court in *Tavares*. There, the purchasers of a new home sued the land developer-builder-vendor to recover $2,083 which the purchasers spent to correct a defective septic system. The purchasers sought money damages, not rescission of the sale transaction and restitution. After reviewing decisions from other jurisdictions in which many courts had adopted an implied warranty rule, we discarded the rule of caveat emptor and embraced this rule: "[W]here a vendor builds new houses for the purpose of sale, the sale carries with it an implied warranty that it is constructed in a reasonably workmanlike manner and is fit for habitation." *Tavares*, 542 P.2d at 1282. In the course of its review of the decisions from other jurisdictions, this court quoted with approval from *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698, 711 (1966):

> The implied warranty of fitness does not impose upon the builder an obligation to deliver a perfect house. No house is built without defects, and defects susceptible of remedy ordinarily would not warrant rescission. But major defects which render the house unfit for habitation, and which are not readily remediable,

entitle the buyer to rescission and restitution.

*Tavares*, 542 P.2d at 1281.

Thus, we see that the implied warranty rule accommodates either a recovery of money damages for minor defects susceptible of remedy or rescission and restitution for major defects which render the house unfit for habitation and which are not readily remediable.

In *Moxley*, the second homeowner sued to recover $3,892 for electrical rewiring and $20 for the cost of the state safety inspection. Like the homeowners in *Tavares*, Moxley did not seek rescission and restitution. In reinstating the amended complaint which alleged a breach of an implied warranty of fitness and habitability, this court reiterated the *Tavares* rationale:

> Courts will judicially protect the victims of shoddy workmanship. Consumer protection demands that those who buy homes are entitled to rely on the skill of the builder and that the house is constructed so as to be reasonably fit for its intended use.

> \*    \*    \*    \*    \*    \*

> It is the structure and all its intricate components and related facilities that are the subject matter of the implied warranty.

> \*    \*    \*    \*    \*    \*

> The purpose of a warranty is to protect innocent purchasers and hold builders accountable for their work.

*Moxley*, 600 P.2d at 735–36.

■ In *Anderson v. Bauer*, 681 P.2d 1316 (Wyo.1984), this court again reviewed liability under the implied warranty rule. Although reversing the developer's liability, this court affirmed the builder's liability for money damages to eight homeowners whose basements had received water seepage. Each homeowner testified about the water seepage, the resulting damage, the dampness, and the inability to use or inhabit the basement. *Id.* at 1323. The corrective action considered necessary included installation of drain tile around foundations

and removal and replacement of two out of eight basement floors. Affirming the damages awards, this court reviewed the rules for recovery of damages in cases involving damage to realty. In cases of permanent injury or great cost of repair, the measure of damages is the difference between the value of the property before and after the injury. In cases of temporary injury or small cost of repair, the measure of damages is the cost of repair. This court also noted that the diminished value of the property is recoverable, in cases in which a public awareness of the particular problem exists. *Id.* at 1324.

Regardless of whether the injury is permanent or temporary in nature, these kinds of damages cannot be determined with mathematical precision and may be inherently uncertain. *Id.* All that is required is "that they be determined with a reasonable degree of certainty based upon the evidence adduced and the nature of the injury." *Id.* at 1325.

■ From these cases no rule emerges that, as builder-vendor here contends, an implied warranty of habitability is breached only by major defects which render the house unfit for habitation. Instead, the unmistakable rule in cases like the present one is that an implied warranty of habitability and fitness is breached if the homeowner proves the existence of a minor construction defect and a resulting temporary injury to the property. The measure of damages is the cost of repair, but may also include the diminished value of the property. The existence, nature and extent of the defect and temporary injury to the property, as well as the measure of damages, are matters for the trier of fact.

■ Our understanding of the nature of the warranty is the same as that found in several other jurisdictions. In South Dakota, "The builder is not required to construct a perfect house and in determining whether a house is defective the test is reasonableness and not perfection." *Waggoner v. Midwestern Development, Inc.*, 83 S.D. 57,

154 N.W.2d 803, 809 (1967); *accord Jeanguneat v. Jackie Hames Construction Company*, 576 P.2d 761, 764 (Okla.1978)[2]. Echoing this standard is *Nastri v. Wood Bros. Homes, Inc.*, 142 Ariz. 439, 690 P.2d 158, 163 (1984): "Arizona does not adhere to the narrow standard * * * that the defect be such that it will not keep out the elements or that it is not a safe place to live." As the court aptly stated, "it would be the height of cynicism to allow a shoddy builder to escape liability because his work was not shoddy enough." *Id.* 690 P.2d at 163. Consistent with the Arizona decision, Illinois holds that "[t]he mere fact that the house is capable of being inhabited does not satisfy the implied warranty." *Petersen v. Hubschman Construction Co. Inc.*, 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154, 1158 (1979). Rejecting the same narrow test urged here by the builder-vendor, the Illinois Supreme Court remarked:

> The use of the term "habitability" is perhaps unfortunate. Because of its imprecise meaning it is susceptible of misconstruction. It would more accurately convey the meaning of the warranty as used in this context if it were to be phrased in language similar to that used in the Uniform Commercial Code, warranty of merchantability, or warranty of fitness for a particular purpose.

*Id.* 27 Ill.Dec. at 750, 389 N.E.2d at 1158. We agree. In this vein we also agree with the suggestion in Comment, *Washington's New Home Implied Warranty of Habitability—Explanation and Model Statute*, 54 Wash.L.Rev. 185, 211–12 (1978):

> A solution to the problems created by the structural and habitability limitations is provided by characterizing the warranty as one of merchantability rather than one of habitability. Using the Uniform Commercial Code by analogy, the builder-vendor would guarantee that, upon sale, the house would be of fair average quality, that it would pass without objection in the building trade, and that it

---

**2.** Annotation, *Liability of Builder–Vendor or Other Vendor of New Dwelling for Loss, Injury, or Damage Occasioned by Defective Condition* *Thereof*, 25 A.L.R.3d 383, 483 (1969), and cases cited therein.

would be fit for the ordinary purpose of living in it.

This warranty would suit the expectations and needs of both parties.  * * * Some courts have already moved in this direction. [*Pollard v. Saxe & Yolles Development Co.*, 12 Cal.3d 374, 115 Cal. Rptr. 648, 525 P.2d 88 (1974); *Wright v. Creative Corp.*, 30 Colo.App. 575, 498 P.2d 1179 (1972); *Gable v. Silver*, 258 So.2d 11 (Fla.Dist.Ct.App.1972); *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795 (Mo.1972); *Schipper v. Levitt & Sons*, 44 N.J. 70, 207 A.2d 314 (1965); *Yepsen v. Burgess*, 269 Or. 635, 525 P.2d 1019 (1974); *Rothberg v. Olenik*, 128 Vt. [295] 306, 262 A.2d 461 (1970) ]. Viewed in this light, the implied warranty of habitability protects the buyer's legitimate expectation that the house is reasonably suited for its intended use.

Applying this construction of the implied warranty to the facts of this case, and drawing all reasonable inferences from those facts in a light most favorable to the homeowners, we find no reason to reverse the judgment entered by the trial court. Although the trial court accepted and based its decision on a standard whether a reasonable homeowner faced with such a defect would be warranted in concluding that a major impediment to habitation existed, *Banville v. Huckins*, 407 A.2d 294, 297 (Me.1979), we follow the appellate rule that this court must affirm the trial court action on appeal if the judgment is sustainable on any legal ground appearing in the record. *Kane v. Kane*, 706 P.2d 676 (Wyo. 1985).

Relying on the ample evidence favorable to the homeowners, the trial court as the finder of fact was justified in finding that: a musty odor emanated from the basements of the townhouses; white rings on the concrete basement floors evidenced the residue of dried water spots; excessive humidity existed in both basements; and the homeowners were reasonably justified in being reluctant to finish the basements as living areas, such as a bedroom, unless the excessive humidity problems were corrected. The trial court was correct in concluding upon these facts that the builder-vendor had breached the implied warranty of workmanship and fitness for habitation as we have described it both in past decisions and here.

• *Failure to Mitigate Personal Property Damages*

Next, we address the builder-vendor's assertion that the evidence showed the Jays failed to mitigate their personal property damages, for which the trial court awarded them $765.

When the Jays moved into their townhome, they stored a variety of personal property in their basement, including musical instruments encased in carrying cases, clothes bags and children's toys. As a result of the dampness and excessive humidity in the basement, these personal property items became moldy over time, and the musical instruments developed rust. Although Mr. Jay detected the dampness in the basement when he first moved into the townhome and although he stored the personal property items in that basement in light of that knowledge, he testified that the builder-vendor led him to believe no problem existed. He further testified that he tried to eliminate the dampness and excessive humidity by running fans and a dehumidifier, and by opening ventilation units.

In *Anderson*, this court explained the homeowner's duty to mitigate damages as being that once an injury occurs, the homeowner must take reasonable measures to protect property so that additional damage would not occur unnecessarily. *Id.* 681 P.2d at 1324. The trial court heard Mr. Jay's testimony under both direct and cross-examination. Relying on the evidence most favorable to Mr. Jay on this issue, the trial court could reasonably conclude that he discharged his mitigation duty. We find no error.

2. *HOMEOWNERS' CROSS–APPEAL*

Turning to the homeowners' cross-appeal contention that the trial court's damages awards were inadequate, we apply this court's standard relating to the

sufficiency of the evidence. *Gasaway v. Reiter*, 736 P.2d 749, 752 (Wyo.1987). The trial court received the evidence from the parties' lay and expert witnesses. As to be expected, the evidence concerning the cause of the dampness and excessive humidity problems, as well as the appropriate remedy and the costs of the remedy, was in conflict. Sorting through that conflicting evidence, the trial court concluded that a perched water table in the ground under the basement was, more likely than not, the source of moisture from which capillary action was fed, leading to excessive humidity and dampness in the basement. The trial court next concluded that the builder-vendor's evidence on the appropriate remedy of installing a capillary break and on the cost of that remedy was reasonable under all the circumstances. We find the evidence sufficient and shall not disturb the trial court's judgment.

Affirmed in all respects.

THOMAS, J., dissents.

THOMAS, Justice, dissenting.

I must dissent from the disposition of this case. The majority, almost expressly, invokes the strict liability theories of the Uniform Commercial Code, §§ 34–21–101 to –1002, W.S.1977, and applies those remedies to real property. The definition of goods in the Uniform Commercial Code obviously excludes realty. Section 34–21–205, W.S.1977. Nevertheless, citing authority that uses the Uniform Commercial Code as a point of reference, the majority adopts the implied warranty of fitness for a particular purpose, as found in Section 34–21–232, W.S.1977, even though the authority relied upon does not go beyond the implied warranty of merchantability found in Section 34–21–231, W.S.1977. This interjection is demonstrated by the focus in the majority opinion upon the inability to finish the basements as living areas.

The result in this case goes far beyond the warranty of habitability as it has been adopted in this jurisdiction in *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733 (Wyo.1979), and *Tavares v. Horstman*, 542 P.2d 1275 (Wyo.1975). Liability is imposed upon the builder-vendor even though that firm was found not to have been negligent. Liability in the absence of negligence, by definition, is strict liability.

The difficulty I have with this resolution is that it does make the builder-vendor an insurer of the construction of the house. Given this potential for strict liability, the builder-vendor, not because of negligence and not because of contract, since normally the home will have been accepted by the purchaser, will be forced to attend to, and repair, even the most minute defects. It will be uniformly less expensive to do that than to attempt to defend a lawsuit in order to demonstrate that the defect would not come within these new theories. The net effect, of course, is to enhance the cost of residences. I perceive that to be unfortunate during a period in the economic history of this nation in which it is becoming more and more difficult for young parents to finance the purchase of homes in which to raise their families.

In my opinion, the remedies developed in our prior cases are adequate to prevent overreaching on the part of the builder-vendor, and it is unnecessary to expand his liability to this degree. I would reverse the judgment because it was premised upon an erroneous rule of law.